# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

MANUEL MURO, VERONICA CHAVEZ, ANGELA MURO,
JOSE MURO, SONIA PINTO, AMY MURO,
SALLY MURO, JOSE MURO, JR., JAVIER MURO,
JUANA MURO, ISAAC RODRIGUEZ,
ALEX GUILLEN , MELISSA GUILLEN, and LUIS RUIZ, SR.



        **Plaintiffs,**

**vs.**                                 **NO.  CIV 03-482 WPJ/RLP**

CITY OF HOBBS, WALTER COBURN, MARK CONGAR, ROBERT COOLEY,
TOM GRONEWALD, EVAN GUNTER, TED FULLER, RICHARD LUNA,
ROBERT WEAVER, ALBERT KEENAN, CHARLES CUNNINGHAM,
JACK WILKISON, CHAD WRIGHT, RONNIE SHAW, CHRIS MCCALL,
DAVID HATHCOX, EUGENE KIM, MICHAEL WEIS, SANDRA VALLES,
MATTHEW HOUSTON, CORY HELTON, DANNY CARTER, STAN DURHAM,
STANLEY BENSON, JEFF WALKER, JOE WALL and JOHN BENEVIDEZ

        **Defendants.**

## THIRD AMENDED COMPLAINT

## I.  INTRODUCTION

    1.  This action alleges police-state type practices by Defendants City of Hobbs and the

individual officers calculated to harass, intimidate and otherwise oppress the Plaintiffs.  Plaintiffs

allege that on August 31, 2002, Defendants subjected them to a series of investigative detentions

without reasonable suspicion, arrests without probable cause, residential searches without

probable cause predicated upon a warrant obtained through material false statements and the

omission of material facts, which were conducted in an unreasonable and abusive manner, and the

warrantless seizure of personal property in the absence of probable cause and exigent

circumstances.  The Muro Plaintiffs further contend that the events of August 31, 2002 were part



of an ongoing campaign of harassment by the Defendant Hobbs Police Department (HPD) directed at them because they are members of and associated with the Muro family and that this includes unlawful seizures and searches which occurred only days earlier, on August 27, 2002, and searches and seizures which occurred in September, 2002, January 2003 and June 2003. Plaintiffs further claim that the unlawful acts alleged herein are part of a pattern, practice, policy and custom of unlawful searches and seizures and retaliatory acts by the HPD. Finally, Plaintiffs contend that the misconduct alleged herein is part of an unwritten custom or policy by the HPD which has permitted or condoned widespread discriminatory law enforcement practices against minority citizens, including Hispanic citizens such as Plaintiffs.

## II.     JURISDICTION AND PARTIES

2.   This action alleges violations of Plaintiffs' First, Fourth and Fourteenth Amendment rights and seeks damages pursuant to 42 U.S.C. §§1981 and 1983.  Plaintiffs also allege that the individual Defendants are liable to them under the New Mexico Tort Claims Act.  Jurisdiction over the federal claims is premised upon 28 U.S.C. §1343.  Supplemental jurisdiction over the state claims against Defendants is predicated on 28 U.S.C. §1367.

3.   Plaintiffs Manuel Muro and Veronica Chavez are Hispanic citizens who reside together in Hobbs, New Mexico at 1109 N. Cochran Street.  Plaintiff Angela Muro is the minor child of Manuel Muro and Veronica Chavez and her claims are brought by Veronica Chavez as her next friend.

4.   Plaintiff Javier Muro, a Hispanic citizen, resided in Hobbs, New Mexico at 1407 West Lea Street on August 31, 2002.  Plaintiff is 18 years old, having been born on April 28, 1984.

5.   Plaintiff Jose Muro (the brother of Manuel Muro and Javier Muro) resides at 409 E.

2

Alston, Hobbs, New Mexico with Plaintiff Sonia Pinto, and their minor children, Amy Muro (9),

Sally Muro (4) and Jose Muro, Jr. (6), all of whom are Hispanic citizens. Plaintiff Pinto brings

this action on behalf of herself and as the next friend of the three minor children. These Plaintiffs'

home at 409 E. Alston is separate, distinct and clearly separated by a fence from Juana Muro's

house at 407 E. Alston.

     6. Plaintiff Juana Muro is the mother of Plaintiffs Manuel Muro, Javier Muro and Jose

Muro, Sr. Juana Muro is also the mother of Plaintiffs Isaac Rodriguez (16), Alex Guillen (10),

and Melissa Guillen (14), all of whom are Hispanic citizens residing with her at 407 E. Alston at

all times material hereto. Ms. Muro is the owner of that residence. All are Hispanic citizens.

Plaintiff Juana Muro brings this action on behalf of herself and as next friend of her three minor

children.

     7. Plaintiff Luis Ruiz, a Hispanic citizen, is a resident of Hobbs, New Mexico.

     8. Defendants Coburn, Conger, Cunningham, Wilkison, Gronewald, Gunter, Fuller,

**Cooley**, Carter, **Luna**, Weaver, Houston, Hathcox, Kim, Shaw, Wright, McCall, Weis, Helton,

Durham, Walker, Wall, Benevidez, Benson and Keenan are residents of Hobbs, New Mexico.

Defendant Valles currently resides out of state. At all times material hereto, Defendants were

employed as police officers for Defendant City of Hobbs and were acting under color of law and

within the course and scope of their duties. Defendants **Cooley,** Cunningham and Shaw were

sergeants. Defendants are sued in their individual capacities

     9. Defendant City of Hobbs is an incorporated municipality within the State of New

Mexico and was the employer of the defendants named in paragraph 8 above. Defendant City of

Hobbs was responsible for the hiring, retention, training, supervision and discipline of all HPD

3

officers, including the individual defendants.

### III. THE UNLAWFUL SEARCHES AND SEIZURES OF AUGUST 31, 2002

#### A. The Background to the Detentions and Searches

10. At approximately 2:00 - 2:30 a.m. on August 31, 2002, Demetrius Lopez and Robert Boyton drove to the Allsup's parking lot in Boyton's red vehicle. Lopez and Boyton became involved in an argument in the parking lot with a group of young men. At the time of the incident, Lopez was on probation as a result of an Aggravated Assault adjudication and his presence at the Allsup's was a violation of the conditions of his probation. The argument became an altercation and punches were thrown. At some point, Cesar Muro, the younger brother of Plaintiffs Manuel Muro, Jose Muro and Javier Muro, punched Lopez in the mouth with his fist. Lopez and Boyton ran to their red vehicle and took off. A black vehicle and a white car drove out of the parking lot after the red car left. Around 2:30 - 2:45 a.m. shots were fired at Boyton's car and Lopez was struck with shotgun pellets and broken glass.

11. Lopez did not notify the police about the incident because he understood he might have to go back to jail for violation of his conditions of probation. However, Boyton called the police and Defendant Luna responded.

12. Defendant Luna conducted the initial interview of Lopez and was told by Lopez that they "were involved in a fight" and that after the fight they attempted to leave but were followed by "unknown offenders who began shooting at them."

13. Subsequently, Lopez and Boyton changed their story. Lopez told HPD officers that he was seated inside Boyton's red car when Cesar Muro hit him with a pistol. Lopez, who is approximately 6'5" and 220 lbs., further claimed that Cesar, 5'3", 130 lbs., robbed him of the shirt

he was wearing. Boyton further claimed they then drove off and were chased by a black Chrysler Sebring and two white cars they could not identify. Boyton further claimed that at some point they heard shots fired behind them and that Lopez was struck by pellets. Boyton and Lopez told different stories as to where they were when the shots were fired. Lopez told police he did not see who had fired the gun because he was not looking in the direction from which the shots had come.

14. Around this time period, HPD officers also responded to a call regarding a stabbing victim. They found the victim in a street not far from the Allsup's. The victim, who had been at the Allsup's, stated that three men had gotten out of a red vehicle, started to fight with him and one of the assailants stabbed him. The victim stated he had then gone to a friend's house on East Scharbauer Street.

## B. The Seizure of Plaintiffs Manuel Muro and Javier Muro

15. Sometime between 2:30 a.m. and 3:00 a.m. that same night (August 31, 2002), Defendant Cooley, the immediate supervisor of Defendant Gronewald, and Defendant Coburn, who had taken charge of this investigation, instructed Gronewald to go to the area of 407 E. Alston, which was the residence where Cesar Muro lived with his mother and several younger siblings. These Defendants further ordered Defendant Gronewald to seize and detain "any subjects" who happened to be in the immediate area of that residence as "possible suspects" in the Lopez shooting. The order from Cooley and/or Coburn was not confined to any particular individual for whom Defendants had probable cause or even reasonable suspicion to believe was involved in the incident reported by Mr. Lopez.

5

16.  During this time period, Plaintiff Manuel Muro drove from his home at 1109 N. Cochran Street to East Alston street in response to a telephone call from Plaintiff Pinto to pick up two of his younger siblings. While he was in the area of 407 E. Alston he was approached by Defendant Gronewald and told that there had been shootings and stabbings that night and that Plaintiff could not leave the area until a detective arrived to interview him.

17.  During this time, Plaintiff Javier Muro had walked to his mother's house at 407 E. Alston and was told by Defendant Gronewald that he could not leave. At least four other individuals were told by Gronewald that they had to remain in the area. Both Plaintiffs Manuel Muro and Javier Muro asked Gronewald why they were being detained. Gronewald stated that he was not aware of any evidence against them and did not know why he had been told to detain them. Subsequently, Defendant Gunter arrived and assisted Gronewald in detaining Plaintiffs.

## C.  The Continued Detention at East Alston Street

18.  While Defendant Gronewald was detaining Plaintiff Manuel Muro and Plaintiff Javier Muro on E. Alston Street, HPD officers stopped a black Chrysler Sebring in which Cesar Muro was a passenger. Cesar and the two other juveniles in the car were arrested and taken to the Hobbs Police Department where they were questioned by Defendant Conger.

19.  According to Defendant Conger's police report, Jennifer Vargas, one of the juveniles, told Conger she had been at the Allsup's when the altercation had occurred and that during the altercation Cesar had hit Robert Boyton with a pistol. According to Conger's report, she further stated that she and Cesar had left the Allsup's on foot, had later been picked up by Chad Dutram (the third juvenile arrested), and were driven by Dutram to Cesar Muro's residence, where Cesar had given the pistol to an unnamed individual who was somewhere "near" his residence.

6

20. Around 4:30 - 5:30 a.m., on E. Alston Street, Defendant Gronewald placed Plaintiff Javier Muro in a police unit where he was forced to remain for over an hour. He was subsequently handcuffed in a painful manner and transported to the police station. After brief questioning, Plaintiff was told he was free to leave. This was about 6:45 - 7:00 a.m. Plaintiff Javier Muro had been detained for around four hours, and the detention constituted a de facto arrest without probable cause.

21. Around the time the sun was beginning to rise, at about 5:30 - 6:00 a.m., Defendant Gronewald informed Plaintiff Manuel Muro on E. Alston Street that the HPD was going to obtain warrants to search 407 E. Alston and 409 E. Alston, respectively, the homes of Plaintiffs Juana Muro and her minor children and of Plaintiffs Jose Muro, Sonia Pinto and their three small children.

22. At this point, Plaintiff Manuel Muro and all the Plaintiffs who lived at 407 and 409 E. Alston were still being detained by HPD officers out in the street. Around 7:15 a.m., Plaintiff Jose Muro, an epileptic, began experiencing symptoms indicating he was about to have a seizure. Plaintiff Sonia Pinto asked Defendant Gunter for permission to go inside her home and get Jose Muro=s medicine, but Defendant Gunter refused to allow her to do so. Finally, Defendant Gronewald told Plaintiff Pinto she could go in with him accompanying her. While Plaintiff Pinto was inside, Plaintiff Jose Muro had a seizure and collapsed.

**D. The Events at 621 2 E. Scharbauer Street**

23. Around 2:30 - 3:00 a.m., HPD officers went to the area of E. Scharbauer Street to investigate the stabbing incident described in paragraph 14 above. Officer Jordan was the first officer on the scene, learned the victim had been at 621 ½ E. Scharbauer earlier and went to that

7

residence to look for evidence of the stabbing.

24.  Upon arriving there, Officer Jordon saw a white Nissan with Texas plates parked on

the street in front of the residence.  According to Officer Jordan's police report, the door to the

car was open and he saw an empty box of Federal brand shotgun shells, the type apparently fired

at the Boyton vehicle, on the driver's seat.  Jordon also found a spent shotgun shell in the front

yard of the residence, called Defendant Coburn about it and was told it was the same type used in

the shooting.

25.  Subsequently, Officer Keenan arrived on the scene.  Around 3:00 - 3:15 a.m.,

Defendant Conger arrived there.  Conger spoke with the resident of 621 ½ E. Scharbauer, who

was outside in the yard, and asked for consent to search the premises.  When the resident refused

to give consent, Defendant Conger told the officers to enter the house and search it to see if

anyone was inside.  At the time the search was carried out, the HPD had no information that

anyone was inside the home or that there were any weapons inside.  Furthermore, no one had

been arrested.  No one was found in the house.

26.  After Defendant Conger left the home, he encountered Joel Ruiz in the yard area.

Joel Ruiz is the son of Plaintiff Luis Ruiz.  Joel Ruiz had driven to 621 ½ E. Scharbauer in

Plaintiff Ruiz's Oldsmobile Cutlass to visit.  Joel Ruiz's name had not been mentioned to the HPD

in connection with any of the above-described incidents being investigated.  Joel Ruiz was

detained and forced by Defendant Conger to remain seated without reasonable suspicion.

According to police reports, Joel Ruiz had verbally criticized  Defendant Conger and the HPD

after their warrantless search of the house at 621 ½ Sharbauer.  When Joel Ruiz attempted to

stand up, he was arrested by Defendants Conger and Keenan for "Resisting, Evading and

8

Obstructing an Officer" and taken to jail.  Joel Ruiz was booked and, inter alia, the key to Plaintiff Luis Ruiz's car was taken from him by Defendant Keenan.

## E.   **Facts Related to Obtaining of the Search Warrants**

27.  Around 7:00 - 7:30 a.m., Defendant Coburn went to a magistrate to obtain a warrant to search 407 E. Alston, the home of Plaintiffs Juana Muro, Isaac Rodriguez, Melissa Guillen and Alex Guillen, and to search 409 E. Alston, the home of Plaintiffs Jose Muro, Sonia Pinto, Amy Muro, Sally Muro and Jose Muro, Jr.  Defendant Coburn also sought a warrant to search 621 ½ E. Scharbauer.  The purpose of the warrants was to search for a pistol, a shotgun and ammunition.    At the time he sought the search warrants, Defendant Coburn had no evidence demonstrating that any residents of 409 E. Alston were involved in the incidents under investigation by the HPD or that the items being sought were located in that residence.  Thus there was no reasonable nexus between Plaintiffs' residence and the items sought.  Additionally, Defendant had no information indicating that Plaintiff Javier Muro, the "suspect" against whom the search warrant was issued, reside at that address, nor did the affidavit provide any evidence supporting a conclusion that Cesar Muro resided there.

28.  Furthermore, in his search warrant affidavit, Defendant Coburn had no evidence amounting to probable cause that the items sought in the warrant were inside 407 E. Alston.  Nor did the affidavit provide any evidence supporting a conclusion that Javier Muro or Cesar Muro resided there.

29.   Defendant Coburn submitted a search warrant to a magistrate judge.  Plaintiff Javier Muro was the named "defendant" and the warrant sought to search the home at 407 E. Alston and the home at 409 E. Alston.  Plaintiff Javier Muro had never resided at 409 E. Alston, and had

not resided at 407 E. Alston, his mother's home, for over two years. In order to obtain the search warrant, Defendant Coburn affirmatively made the false allegation that Plaintiff Javier Muro resided at either or both of those residences.

30. In the search warrant affidavit, Defendant Coburn failed to allege he had personal knowledge that Plaintiff Javier Muro resided at either address and failed to allege any information which would have permitted the magistrate to reasonably infer that Plaintiff resided at either residence.

31. Defendant Coburn sought to obtain the search warrant for 407 E. Alston and 409 E. Alston based on information he alleged was relayed to him by Defendant Conger regarding a conversation Defendant Conger had with Jennifer Vargas. As set forth in paragraph 19 above, Ms. Vargas had told Defendant Conger that she had seen Cesar Muro give a pistol to an unidentified "subject that was near his house."

32. In an effort to create a colorable basis for searching the homes of Plaintiffs Jose Muro, Sonia Pinto and Juana Muro, Defendant Coburn materially misrepresented the information Defendant Conger obtained from Jennifer Vargas in order to make it appear that Ms. Vargas had told Conger that Plaintiff Javier Muro (who did not live at either 409 or 407 E. Alston) had been involved in the Lopez shooting and that Plaintiff Javier Muro (or another person) had taken a handgun into 409 or 407 E. Alston. In his affidavit, Defendant Coburn falsely stated that Ms. Vargas told Defendant Conger that Plaintiff Javier Muro had been in a black car driven by Chad Dutram when it left the Allsup's, that Plaintiff Javier Muro was in that car when she and Cesar were given a ride, that she observed Cesar give Plaintiff Javier Muro, or another person, a handgun in front of 407 and 409 E. Alston and that the recipient of the gun then walked toward

10

the residences.

33  In fact, Ms. Vargas had told Defendant Conger that Javier Muro might have been in the Dutram vehicle, had told Conger that Javier Muro might have been in Dutram's car when she and Cesar were given a ride to 407 E. Alston, had not told Conger that she observed Javier Muro or anyone else be given a pistol by Cesar Muro in front of 407 or 409 E. Alston, had not told Conger that she had seen the recipient of a handgun walk toward either residence and had told Conger she had seen two individuals walk to 407 E. Alston. As stated above, according to Defendant Conger's police report, Ms. Vargas never even mentioned Javier Muro and instead told Conger that Cesar Muro had given a handgun to an unidentified person "that was near his house," information which in no way indicated that the alleged evidence was located in either house and actually tended to negate such a probability. Furthermore, while HPD records showed that Cesar Muro resided at 407 E. Alston, not 409 E. Alston, Coburn's affidavit did not provide any information about where Cesar Muro actually resided or how Jennifer Vargas would know where Cesar Muro resided.

34.  In a further effort to support the issuance of a search warrant, Defendant Coburn omitted from his affidavit for the search warrant the evidence that Mr. Lopez had told Officer Luna that he had been in a fight at the Allsup's, had not claimed he had been robbed, and had stated that he did not know who was in the vehicles that followed Boyton's car. Instead, Defendant put forward Lopez's second story - that he was sitting in a car in the Allsup's parking lot when Cesar Muro robbed him at gunpoint and falsely made it appear that Lopez said the shots were fired from a black Sebring containing Plaintiff Javier Muro, when, in fact, Lopez had told Coburn three vehicles were pursuing him, he was crouching down at the time of the shooting and

did not know who the shot had come from.

35. In order to obtain a warrant to search 621 ½ E. Scharbauer, Defendant Coburn stated in his affidavit that a spent shotgun shell had been found in the street in front of the residence and that the driver of the white Nissan located in front of that residence, the car in which an empty shotgun shell box had been seen, was inside the residence. Defendant Coburn had not been at 621 ½ E. Scharbauer and none of the reports of the HPD officers who were there contain such information. Furthermore, Defendant Coburn omitted the fact that Mr. Boyton had been taken to the residence and was unable to identify the vehicle as having been involved in the alleged chase.

36. As a result of Defendant Coburn's false statements and material omissions, a single search warrant was issued authorizing searches for two guns, ammunition and proof of residence at both 407 and 409 E. Alston, and a second search warrant, based on the identical affidavit, was issued to search the house at 621 ½ E. Sharbauer. Furthermore, the search warrant failed to state probable cause on its face.

## F. Facts Relating to the Search of 409 E. Alston

37. Sometime between 8:15 and 8:45 a.m. on August 31, 2002, Defendant Fuller, who had assisted Defendant Coburn in preparing the search warrant, led a team of HPD officers in executing the single search warrant Coburn had obtained for both 407 E. Alston and 409 E. Alston. Defendants Weaver, Gronewald, Gunter, Valles and Houston were the other participants in the searches.

38. Defendants Fuller, Weaver, Gronewald, Gunter, Valles, and Houston entered and searched the home of Plaintiffs Jose Muro, Sonia Pinto, Amy Muro, Sally Muro and Jose Muro,

12

Jr. around 8:15 - 8:45 a.m. on August 31, 2002. Defendants ransacked the entire home. Pans were thrown on the kitchen floor, garbage was dumped onto the floor and cabinet ceilings were damaged. In the living room, table drawers were emptied and the contents thrown on the floor. In the bedrooms, clothing was taken out of the dresser drawers and closets and dumped onto the floor. In the bathrooms, items were taken from cabinets and thrown to the floor while the contents of the garbage cans were scattered on the floor. Defendants also searched a Buick Riviera located at the premises, ripping out the backseat in such a manner that it no longer fits properly. Defendants executed the search warrant in an unreasonable and destructive manner.

39. After completing the search in which no evidence connected to the Allsup's incident or the shooting of Mr. Lopez was found, Defendants gave a copy of the search warrant to Plaintiffs Jose Muro and Sonia Pinto. Around 10:30 a.m. or later, Plaintiffs Jose Muro and Sonia Pinto were allowed to enter their home.

## G. Facts Relating to the Search of 407 E. Alston

40. After finishing their search of 409 E. Alston, Defendants Fuller, Weaver, Gronewald, Gunter, Valles and Houston proceeded to enter and search the home of Plaintiffs Juana Muro and her three minor children. Defendants ransacked the entire home. Trash was dumped and left on the floor. Dresser drawers were emptied, dumped and left on the floor. Sheets were stripped off the beds and thrown to the floor. Closets were emptied and the contents thrown haphazardly on beds or floors. The search found no evidence of any crime. Defendants executed the search warrant in an unreasonable and destructive manner.

## H. Facts Relating to the Search of Plaintiff Ruiz's Property

41. Between 8:00 a.m. and 8:45 a.m., Defendant Conger led a search team, including

13

Defendant Keenan and others, in executing a search warrant at 621 ½ E. Scharbauer. In addition
to searching the house, Defendants searched the Oldsmobile Cutlass owned by Plaintiff Ruiz,
which had been driven by his son Joel and was parked in the driveway area. The search warrant
affidavit contained no facts implicating Joel Ruiz or the Oldsmobile in the incidents under
investigation and contained no facts suggesting that the items sought in the warrant - a pistol, a
shotgun and ammunition - might be located in Plaintiff's car.

42. Nevertheless, Defendant Keenan searched Plaintiff Ruiz's Oldsmobile and found
nothing sought by the search warrant. However, Defendant Keenan did find personal property of
Plaintiff Ruiz in the trunk of his car, including his gas powered leaf blower, his tap and die set, his
drill, several of his tool boxes and numerous tools, plus his son Joel's compact discs and guitar
amplifiers.   Defendant Carter had a check run to ascertain whether the property had been
reported stolen and was informed none of it had been. Additionally, upon information and belief,
Plaintiff alleges that one or more Defendants had or allowed Plaintiff's car stereo to be removed
from the vehicle. Despite the fact that Defendants had no warrant for these items, lacked exigent
circumstances and had no probable cause to believe they were evidence of a crime, Defendants
Keenan, Carter and/or Conger illegally seized all the personal property described above.

43. On August 31, 2002, Plaintiff Ruiz went to the Hobbs Police Department to obtain
the release of his son and to ascertain what had happened to his property. The Hobbs Police
Department refused to give Plaintiff back his car keys (seized at the time of Joels'arrest), falsely
claiming they were "evidence"of a crime. Plaintiff Ruiz is disabled, having lost a leg due to
diabetes, his Oldsmobile contains his handicapped license plate, and the car keys seized by
Defendant Keenan were the only set of car keys Plaintiff had. The Hobbs Police Department also

14

refused to return any of his other personal property illegally seized from his car.

44. At no time before or after the seizure did Defendants provide Plaintiff Ruiz with written notice of the property seized and an opportunity for a hearing.

45. On or about September 8, 2002, Plaintiff Ruiz' car keys were returned to him. On or about September 18, 2002, the leaf blower, the tools, the tool boxes, the compac discs and the guitar amplifiers were returned. Plaintiff's car stereo has still not been returned.

## I. Plaintiffs' Multiple Legal Claims Arising Out of the Events of August 31, 2002

46. At all times material hereto, all Defendants acted intentionally, wilfully, deliberately and/or with deliberate indifference to the rights of the Plaintiffs.

47. **Plaintiff Manuel Muro** was detained for approximately six hours. Defendants had no objective, articulable facts which would have led a reasonable police officer to believe Plaintiff had committed or was about to commit a crime at the time the detention began. During this time period, no Defendant questioned Plaintiff in order to confirm or dispell any suspicion that Plaintiff might have committed the crimes under investigation. Furthermore, the six hour seizure was so long in length that it amounted to a de facto arrest for which Defendants Coburn, Cooley, Gronewald and Gunter had no probable cause. The acts of these Defendants violated Plaintiff Manuel Muro' Fourth and Fourteenth Amendment rights to be free from unreasonable seizures of his person.

48. **Plaintiff Javier Muro** was detained for approximately four hours. During part of this time he was forced to stay in a police unit, was handcuffed and was transported to the police station for interrogation. Plaintiff's initial seizure was conducted in the absence of reasonable suspicion. During the four hours Plaintiff was seized prior to being transported to the police

15

station, no Defendant questioned Plaintiff about the incidents under investigation in order to confirm or dispell any suspicion that he was involved in any criminal conduct. Furthermore, the conditions of Plaintiff's detention, including the length of the detention, his placement in a police car, his handcuffing and his being transported to the police station amounted to a de facto arrest for which Defendants Coburn, Cooley, Gronewald and Gunter had no probable cause. Because Defendants had no probable cause to arrest Plaintiff Javier Muro, his handcuffing constituted use of unreasonable force against him. The acts of Defendants violated Plaintiff Javier Muro's Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures of his person.

49. **Plaintiffs Jose Muro, Sonia Pinto, Amy Muro, Sally Muro and Jose Muro, Jr.** were subjected to an unreasonable search of their home as a result of the unlawful conduct of Defendant Coburn in: a) ordering a search of their home without probable cause, b) making false material statements in and omitting material facts from his affidavit in order to obtain a warrant to search their home, and/or c) carrying out the search in an abusive and improper manner. Defendant Fuller is liable for executing the search warrant because he knew or should have known it did not contain probable cause to search Plaintiffs' home. Defendants Coburn, Fuller, Weaver, Valles and Houston are liable for the unreasonable manner in which they executed the search warrant. Defendants Coburn, Gronewald and Gunter are liable for removing Plaintiffs from their home and/or for not allowing them to go into their home. The acts of these Defendants violated the Fourth and Fourteenth Amendment rights of these Plaintiffs to be free from unreasonable searches of their home and seizures of their persons.

16

50. **Plaintiffs Juana Muro, Alex Guillen, Melissa Guillen and Isaac Rodriguez** were subjected to an unreasonable search of their home as a result of the unlawful conduct of Defendant Coburn in a) ordering a search of their home without probable cause, b) making false material statements in and omitting material facts from his affidavit in order to obtain a warrant to search their home, and/or c) carrying out the search in an abusive and improper manner. Defendant Fuller is liable for executing the search warrant because he knew or should have known it did not contain probable cause to search Plaintiffs' home. Defendants Coburn, Fuller, Weaver, Valles and Houston are liable for the unreasonable manner in which they executed the search warrant. Defendants Coburn, Gronewald and Gunter are liable for removing Plaintiffs from their home and/or for not allowing them to go into their home. The acts of these Defendants violated the Fourth and Fourteenth Amendment rights of these Plaintiffs to be free from unreasonable searches of their home and seizures of their persons.

51. **Plaintiff Luis Ruiz** was subjected to an unlawful search of his vehicle as a result of the conduct of Defendants Coburn, Conger, and Keenan and was subjected to an unlawful seizure of his personal property by Defendants Carter, Keenan and/or Conger. The acts of these Defendants violated Plaintiff Ruiz's Fourth and Fourteenth Amendment right to be free from unreasonable searches and seizures of his property and his right not to be deprived of his property without due process of the law. Defendants also violated Plaintiff's state constitutional rights to be free from unreasonable search and seizure of his property and not to be deprived of his property without due process.

52. The unlawful searches and seizures of **Plaintiffs Manuel Muro, Javier Muro, Jose Muro, Sonia Pinto and Juana Muro** complained of herein were motivated, in whole or in part,

17

by an animus against Plaintiffs because they are members of and associated with the Muro family and/or because Plaintiffs Manuel Muro and Javier Muro had exercised their right to petition for redress of grievances.  These acts were part of a continuing pattern of harassment of these Plaintiffs.  Defendants' conduct was arbitrary, capriciously motivated by ill will and/or personal vindictiveness and had no legitimate governmental purpose.  The acts of the Defendants involved in ordering and executing the seizures and the searches complained of herein violated Plaintiffs' first and Fourteenth Amendment rights to freedom of association, freedom of speech, and to the equal protection of the law

## IV.  THE UNLAWFUL SEIZURES AND SEARCHES OF AUGUST 27, 2002

### A.  The Facts Surrounding the Unlawful Seizures

53   On February 11, 2002, Plaintiff Manuel Muro filed a written complaint against Defendant Wilkison because he had been subjected to an unlawful seizure by Wilkison on February 2, 2002.  On or about August 24 or 25, 2002, Plaintiff made a verbal complaint to HPD alleging that Defendant Wilkison had harassed, threatened and attempted to intimidate Plaintiff that night (August 24 or 25).

54.  At approximately 11:07 p.m. on August 26, 2002, the HPD received a call from North Gila Street reporting a drive-by shooting.  The caller stated that shots had been fired from a black Chrysler Sebring and described the persons in the car.  Neither the vehicle nor any of those inside it fit the description of any vehicle owned by any member of the Muro family or of any family members

55.  Defendant Wilkison went to interview the reporting party who told him the same information reported to the dispatcher, described in the preceding paragraph.  Despite this,

Defendant Wilkison attempted to coerce the reporting party, who had been in the vehicle at which the shots had been fired and had seen the vehicle from which the shots came, into stating that "the Muros" had been the shooters.

56.  At approximately 11:16 p.m., the HPD received another report of a shot fired at a different location, on South McKinley Street.  The HPD dispatcher reported that a caller was claiming that a shot had been fired from a black vehicle similar to that owned by Plaintiff Manuel Muro.  The caller stated that two Hispanic males had been in the car.  At about 11:26 Officer Rivera went to the scene of that alleged shooting.  No one interviewed at the scene could identify anyone who was in the black car.

57.  At approximately 11:40 p.m., Defendant Wright and a second officer conducted a felony-type stop on a green Honda in order to determine whether it was the vehicle involved in the reported shootings.  The two citizens in the car were handcuffed, patted down, placed in a police unit and then released after about ten minutes.

58.  At approximately 12:00 a.m., Defendant Wilkison and other Defendants observed a pick-up truck, owned by Plaintiff Veronica Chavez and driven by Plaintiff Manuel Muro, pull up to 407 E. Alston. Manuel Muro and Veronica Chavez are married and have a two year old baby named Angela.  Plaintiff Manuel Muro had driven to 407 E. Alston to let Plaintiff Alex Guillen, Plaintiff Isaac Rodriguez, Cesar Muro and another young man off at their home.  Plaintiff Veronica Chavez, driving Plaintiff Manuel Muro's black Pontiac, was following the pick-up with Plaintiff Melissa Guillen, Angela Muro, her two year daughter, and a cousin, Maura, also in the car.

19

59.  According to police reports, because Defendant Wilkison observed "two male subjects known to me as Muro's" get out of the pick-up at Plaintiff Juana Muro's house, a felony stop was conducted on both vehicles.    A Defendant, using an amplification device, ordered Plaintiff Manuel Muro and another individual to get back in the vehicle.  Defendants Wilkison, Cunningham, Kim, Wright, Shaw, McCall, Hathcox and Gunter had shotguns, rifles and handguns pointed at all the young people in the two vehicles.  Plaintiffs were told that Defendants had deadly force trained upon them which could be used and were ordered to remain in the vehicles.

60.  Plaintiff Veronica Chavez was told to throw the car keys onto the street and did so. Plaintiff told Defendants she had her baby daughter in the car and asked why she had been pulled over.  A Defendant responded by telling Plaintiff "we have you at gunpoint and we're gonna call you out one by one "

61.  Plaintiff Veronica Chavez was the first person ordered out.  At about 12:06 a.m., she was ordered to place her hands in the air and walk backwards to the middle of the street where Defendants were situated.  Upon arrival at that location, Veronica Chavez was ordered to put her hands behind her back and was roughly handcuffed by a defendant, believed to be Defendant Wright.  Plaintiff was put into a police car.  The handcuffs were very tight and were causing pain to Plaintiff. She told this to a Defendant who ignored her.  Because of the substantial pain she was suffering, Plaintiff repeatedly asked Defendants to loosen the handcuffs.  Defendants continued to ignore her for about 35-40 minutes until an officer removed the handcuffs from behind her back. During the entire time of her forcible detention, which lasted about an hour and a quarter, Defendants failed to ask Plaintiff Chavez any questions calculated to either confirm or dispel whatever reasonable suspicion Defendants may have had that she had committed or was about to

commit a crime and failed to diligently pursue a means of investigation calculated to accomplish this. In fact, Defendants had no information to justify such suspicions. At no time was Plaintiff told she was free to leave and, in fact, she was not free to do so.

62. Plaintiff Melissa Guillen, 14 years old, was ordered to exit the car in the same manner as Plaintiff Veronica Chavez. Plaintiff Melissa Guillen was roughly handcuffed and put into a separate police unit where she sat for approximately one hour. During the entire time of her forcible detention, Defendants failed to ask any questions calculated either to confirm or dispel any reasonable suspicion Defendants may have had that Plaintiff Melissa Guillen had committed or was about to commit a crime and failed to diligently pursue a means of investigation calculated to accomplish this. In fact Defendants had no information to justify such suspicion. At no time was Plaintiff told she was free to leave and, in fact, she was not free to do so.

63. After Plaintiff Veronica Chavez and the two girls (Melissa Guillen and the cousin) were taken out of the Pontiac, Defendants ordered Plaintiff Manuel Muro and the boys out of the pick-up. During the approximately 15 minutes it took to accomplish this, Plaintiff Veronica Chavez was separated from her two year old daughter, Angela, who was left unattended in the Pontiac.

64. Plaintiff Manuel Muro had recently had surgery on his foot and was wearing a soft cast. At about 12:13 a.m., Plaintiff was ordered out of the pick-up truck and attempted to walk backwards in the manner ordered, but was having difficulty due to his injury. When Plaintiff attempted to explain the problem to Defendants, he was ordered by one Defendant, believed to be Defendant Kim, to "shut the f____ up." When Plaintiff got to where he was instructed to go, he placed his hands behind his back as ordered and was roughly grabbed by a Defendant, believed to

21

be Defendant Wright. This Defendant began yanking Plaintiff backwards by his hands causing Plaintiff's injured left foot to drag along the pavement and reopening the wound on his foot. Plaintiff was handcuffed and put in a police unit. During the time of his forcible detention, Defendants failed to ask Plaintiff any questions calculated to confirm or dispel any reasonable suspicion Defendants may have had that Plaintiff had committed or was about to commit a crime until after Plaintiff's car was searched, which was about an hour and a half after he was initially detained. At no time was Plaintiff told he was free to leave and, in fact, he was not free to do so. Defendants failed to diligently pursue a means of investigation calculated to determine whether Plaintiff had committed a crime.

65. At about 12:18 a.m., ten-year-old Plaintiff Alex Guillen was ordered out of the pick-up truck, ordered to walk backwards to the police units and ordered to sit on the street curb where he was forced to remain for over an hour. During the entire time of his forcible detention, Defendants failed to ask Plaintiff Alex Guillen any questions calculated to confirm or dispel any reasonable suspicion Defendants may have had that Plaintiff Alex Guillen had committed or was about to commit a crime and failed to diligently pursue a means of investigation calculated to accomplish this. In fact, Defendants had no such suspicion. At no time was Plaintiff told he was free to leave and, in fact, he was not free to do so.

66. Plaintiff Isaac Rodriguez was ordered out of the pick up, told to walk backwards and was handcuffed and put in a police unit where he sat for approximately one hour. During the entire time of his forcible detention, Defendants failed to ask Plaintiff Rodriguez any questions calculated to confirm or dispel any reasonable suspicion Defendants may have had that Plaintiff had committed or was about to commit a crime and failed to diligently pursue a means of

22

investigation calculated to accomplish this. In fact, Defendants had no such suspicion. At no time was Plaintiff told he was free to leave and, in fact, he was not free to do so.

67. After approximately 15 to 20 minutes, the two vehicles had been emptied. At this point, two Defendants approached the black Pontiac, one on each side of the car, with their guns drawn and pointed at the car with two-year-old Plaintiff Angela, the only occupant. One of the Defendants opened the door and finally Angela was removed from the car and given to Plaintiff Manuel Muro's mother. Defendant Wilkison, and/or other Defendants, then opened the car door and trunk to Plaintiff Manuel Muro's car without a warrant or consent, and looked around. Defendants also opened Plaintiff Chavez's truck door and looked around.

68. Plaintiffs were kept in the police vehicles in handcuffs, for almost an hour while Defendants milled around, joked with one another, used profanity, and told stories to one another while trying to decide what to do. Defendants knew they had no probable cause to arrest any Plaintiff but continued to detain them anyway. This lengthy detention constituted a de facto arrest without probable cause.

69. After Plaintiffs had been detained for approximately one hour, Defendants decided they were going to obtain a search warrant to search both the Pontiac and the pick-up truck based solely on the report that 45 minutes earlier a shot had allegedly been fired from a car matching the description of Plaintiff Manuel Muro's black Pontiac. Recognizing that Defendants had no lawful basis for the continuing detention of Plaintiffs, Defendants Cunningham and Weis, who arrived at the scene after the felony stop, decided to seek a search warrant, tow the two vehicles to the police station while the warrant was being sought, and release everyone who was being detained.

23

70. Defendant Cunningham informed Plaintiffs Veronica Chavez and Manuel Muro of their plans. Plaintiff Chavez was upset about the possible cost and inconvenience of Defendants' plan to tow the vehicles. At the time, Plaintiffs had been subjected to a felony stop, with weapons drawn on them, handcuffed and held in police units for an hour surrounded by numerous officers. When Plaintiffs consented to the search of their vehicles, they were not informed that they had a legal right to refuse to consent to the search.

71. Under these circumstances, Plaintiffs agreed to allow their vehicles to be searched so long as they were not towed. Defendant Kim then conducted a warrantless search of the car and Defendants Wilkison and Weiss searched the pick-up. All areas of the car, including the trunk, were searched. During the course of searching the pick-up truck, the glove compartment box and seat handle were broken, requiring Plaintiff Chavez to spend over $150 in repairs. No evidence of the crimes that purportedly caused the seizure or any contraband was found. None of the occupants of either vehicle was ever arrested or charged in connection with the events of that evening.

72. Upon information and belief, the decision to initiate a felony stop on both vehicles was initiated by Defendant Wilkison. Plaintiffs further allege that Defendant Cunningham was in charge of the seizures once Plaintiffs had been stopped.

**B. Plaintiffs' Multiple Legal Claims Arising Out of the Events of August 27, 2002**

73. The warrantless seizure of **Plaintiff Manuel Muro** was unreasonable under the totality of the circumstances. These circumstances include cursing at Plaintiff, the rough manner in which he was handcuffed and forced to remain cuffed, dragging Plaintiff along the street after he had told Defendants his foot was injured, confining him in a police car and keeping him

24

detained in this manner for almost all of the 75 minute detention. The unreasonableness of Defendants' conduct was compounded by the fact that Defendants forcibly detained Plaintiff in this manner without undertaking a diligent investigation calculated to promptly confirm or dispel any suspicion they might have had that Plaintiff was involved in the alleged McKinley street incident. The seizure of Plaintiff was the functional equivalent of an arrest without probable cause and violated Plaintiff's Fourth Amendment rights.

74. Furthermore, under the totality of the circumstances described above and the fact that a protective sweep for weapons in the car had already occurred, the second warrantless search of the trunk of Plaintiff Manuel Muro's car was unreasonable because Defendants had not obtained voluntary consent to search the car from Plaintiff.

75. The warrantless seizure of **Plaintiff Veronica Chavez** was unreasonable under the totality of the circumstances. These circumstances include the level of force used against her, handcuffing her in a rough and painful manner, keeping her handcuffed for 35-40 minutes, confining her to a police car, keeping her detained in this manner for about 75 minutes despite the fact that Defendants had <u>no</u> information that Plaintiff Veronica Chavez had been present at McKinley Street at the time of the reported shooting. The unreasonableness of Defendants' conduct was compounded by the fact that Defendants forcibly detained Plaintiff in the above-described manner without undertaking a diligent investigation calculated to promptly confirm or dispel any suspicion they might have had that Plaintiff had been involved in the incident. The seizure of Plaintiff Veronica Chavez was the functional equivalent of an arrest without probable cause and violated her Fourth Amendment rights.

25

76.  Furthermore, under the totality of the circumstances described above, the warrantless search of Plaintiff's pick-up truck was unreasonable because Defendants had no probable cause to search the truck at the time of the search, failed to obtain voluntary consent to search from Plaintiff and conducted the search in an improper manner.

77.  The warrantless seizure of two-year-old **Plaintiff Angela Muro** was unreasonable under the totality of the circumstances.  Defendants knew that Plaintiff Veronica Chavez's baby was in the vehicle, separated from her mother.  Defendants knew that Plaintiff Angela Muro was in the car alone after the two vehicles had been emptied and that executing the removal of the two-year-old by approaching the car with guns drawn and pointed was unnecessary, unreasonable and violated the baby's Fourth Amendment rights.

78.  The warrantless seizure of ten-year-old **Plaintiff Alex Guillen** was unreasonable under the totality of the circumstances.  These circumstances include the fact that Defendants had no information that this 10-year-old boy was involved in the alleged incident at McKinley Street, the manner in which he was taken from the car to the street, and the fact he was then forced to sit on the street curb for an hour.  The unreasonableness of Defendants' conduct was compounded by the fact that they failed to conduct a diligent investigation calculated to promptly confirm or dispel any suspicion they might have had that Plaintiff had been involved in the incident.  The seizure of Plaintiff Alex Guillen was the functional equivalent of an arrest without probable cause and violated his Fourth Amendment rights.

79.  The warrantless seizure of **Plaintiff Melissa Guillen** was unreasonable under the totality of the circumstances.  These circumstances include the fact that Defendants had no information that this 14-year-old girl was involved in the alleged incident at McKinley Street, the

rough and painful manner in which she was handcuffed, and the fact that Defendants' confined her in a police car for over an hour. The unreasonableness of Defendants' conduct was compounded by the fact that they failed to conduct a diligent investigation calculated to promptly confirm or dispel any suspicion they might have had that Plaintiff had been involved in the incident. The seizure of Plaintiff Melissa Guillen was the functional equivalent of an arrest without probable cause and violated her Fourth Amendment rights.

80. The warrantless seizure of **Plaintiff Isaac Rodriguez** was unreasonable under the totality of the circumstances. These include the rough and painful manner in which he was handcuffed and the fact that he was confined in a police car for over an hour. The unreasonableness of Defendants' conduct was compounded by the fact that they failed to conduct a diligent investigation calculated to promptly confirm or dispel any suspicion they might have had that Plaintiff had been involved in the incident. The seizure of Plaintiff Isaac Rodriguez was the functional equivalent of an arrest without probable cause and violated his Fourth Amendment rights.

### V.   THE UNLAWFUL ARREST OF PLAINTIFF ISAAC RODRIGUEZ ON SEPTEMBER 14, 2002

81. After the February, 2002 incident (described below in Part X of this Second Amended Complaint) and again after the August 27, 2002 detention outside 407 E. Alston, (described above), Plaintiffs Manuel Muro and Veronica Chavez filed complaints with the HPD Internal Affairs Department against Defendant Wilkison and several other HPD officers.

27

82.  On September 14, 2002, at about 7:30 p.m., Plaintiff Isaac Rodriguez, age 15, went to the St. Helena Catholic Church Family Fair.  As he neared the location of the church, he was attacked and repeatedly struck by a group of young men.  After the assailants left, Plaintiff, bleeding from his mouth, walked toward the church.

83.  As Plaintiff approached the church, Defendant Durham detained him for the purpose of interrogating him about the fight.  Defendant, a detective, began to question Plaintiff as a suspect and spoke to him in an accusatory manner.  Defendant did not inform Plaintiff of the state law rights Defendant was required to inform him of pursuant to §32A-2-14(C) NMSA.  When Plaintiff tried to explain that he had not started the altercation and had, in fact, been injured, Defendant responded in a manner which indicated to Plaintiff that Defendant had no interest in hearing what Plaintiff had to say.

84.  Plaintiff became frustrated with the accusatory and hostile manner in which Defendant was treating him.  According to Defendant Durham's  police report, after he began questioning Plaintiff, Plaintiff "loudly" asked "why are you always f___ ing with me?"  According to Defendant, after he told Plaintiff not to use any cuss words, Plaintiff, while describing where certain people had run, used the phrase "they f___ing ran that way."  Defendant Durham and Defendant Walker then arrested Plaintiff for disorderly conduct and took him to jail.  Defendants attempted to justify the arrest in their reports by claiming that one individual in the area was supposedly "offended" by what she overheard Plaintiff to say.

85.  Defendants arrested Plaintiff Isaac Rodriguez for engaging  in conduct protected by the First Amendment and violated Isaac Rodriguez's First Amendment right to free speech and his

Fourth Amendment right to be free from unreasonable seizures. Additionally, Defendants' conduct constituted a seizure of his person without probable cause in violation of his Fourth Amendment rights and also constituted an unlawful use of force. Furthermore, because §32A-2-14(C) NMSA placed substantive limitations on Defendants' discretion regarding the interrogation of a juvenile and Defendants Durham and/or Walker interrogated Isaac in violation of the mandatory duty imposed on them by that statute, Defendants' conduct violated Isaac's liberty interest protected by the due process clause of the Fourteenth Amendment. Defendants' conduct also constituted a false arrest, a false imprisonment, a battery and a violation of rights secured to Plaintiff by the New Mexico State Constitution and by §32A-2-14(C) and is actionable under the New Mexico Tort Claims Act, §41-4-12 NMSA. Moreover, Defendant Durham knew his conduct was unlawful because the New Mexico Court of Appeals in *State v. Hawkins* 128 NM 245 (Ct. App. 1999) had reversed a disorderly conduct conviction arising from an arrest made by Durham for the use of similar language by a citizen.

## VI.   THE FAILURE TO PROVIDE POLICE SERVICE TO PLAINTIFFS MANUEL MURO AND VERONICA CHAVEZ

86. Not long after the latter complaint was filed, on September 28, 2002, a group of men came onto the property of Plaintiffs Manuel Muro and Veronica Chavez armed with baseball bats, beer bottles, bricks and a shotgun. One individual threatened Plaintiff Manuel Muro with the shotgun, an action which constituted a felony under New Mexico law. Plaintiff Chavez called the HPD and reported that people had come onto their property and were threatening them with weapons.

87.  Several officers, including Defendants **Luna and** Gunter, responded.  The attackers were still in the immediate area of Plaintiffs' property at the time.  Plaintiffs gave the officers a summary of what had occurred, including the fact that Plaintiff Muro had been assaulted with a shotgun.  However, Defendants **Luna and** Gunter and the other officers present failed to take a statement from either Plaintiff, failed to obtain statements from the attackers, failed to undertake lawful efforts to search the attackers' vehicle for the shotgun, failed to otherwise adequately investigate the armed attack on Plaintiff Muro and the trespass onto the property of both Plaintiffs, failed to file criminal complaints for aggravated assault and/or trespass and failed even to file a police report on the incident.

88.  Instead, Defendant Gunter told Plaintiffs that nothing would be done because "the Muro's are shooters" and he claimed, it would be hard to tell what had occurred.

89.  The Defendant HPD officers failed to investigate the aggravated assault on Plaintiff Manuel Muro at his home reported by Plaintiffs despite the mandatory duty imposed on them by §29-1-1, NMSA to investigate all crimes reported to them.  The HPD failed to investigate the reported felony in whole or in part in retaliation for Plaintiffs Manuel Muro and Veronica Chavez having exercised their First Amendment right to file complaints against HPD officers and/or because Plaintiffs are members of the Muro family.

90.  At all times material hereto, Defendants acted intentionally, wilfully, and/or with deliberate indifference to the rights of Plaintiffs.  Defendants' conduct was arbitrary, capricious, motivated by ill-will and personal vindictiveness and had no legitimate governmental purpose.  Defendants' refusal to provide police service violated Plaintiffs' First Amendment rights to free

speech, to petition for redress and to free association and their Fourteenth Amendment rights to equal protection and due process of the law.  To the extent the conduct was negligent, it violated Plaintiffs' state law rights and is actionable under the New Mexico Tort Claims Act.

## VII. THE UNLAWFUL SEARCH OF PLAINTIFF JUANA MURO'S HOUSE ON JANUARY 10, 2003 AT ABOUT 4:45 p.m.

91.  On January 10, 2003, Plaintiff Juana Muro went to 409 E. Alston and asked Plaintiff Sonya Pinto to call the Hobbs Police Department to report that she was being verbally harassed by another woman.  The dispatcher was specifically informed that no weapons were involved. Defendants Hathcox and Benevidez were dispatched to 409 E. Alston to investigate the call.

92.  Upon arrival at the scene, instead of going to 409 E. Alston to speak with Plaintiff Muro, Defendant Benevidez went to 407 E. Alston to speak with the woman who had been arguing with Plaintiff.  This woman was standing in front of 407 E. Alston, a home owned by Plaintiff.  Benevidez was told the woman did not live there.

93.  When Defendant Hathcox arrived, he saw Benevidez talking to the woman in the doorway of Plaintiff's home.  Hathcox went to 409 E. Alston and spoke with Plaintiff who told him about the argument and told him she was the owner of 407 E. Alston.

94   Defendant Hathcox then walked over to Plaintiff's house, which Defendant Benevidez had entered after ordering the other woman to go inside.  Hathcox walked into Plaintiff's house and proceeded to conduct a search of the premises, which involved walking down the hall,

looking into each bedroom and opening the bathroom door to look in that room. The woman who had been arguing with Plaintiff was subsequently told to go home.

95. Defendants Hathcox and Benevidez entered and searched Plaintiff's house without a warrant, in the absence of probable cause to believe contraband was there, in the absence of exigent circumstances and without consent. In fact, the search was not conducted in furtherance of the investigation of a crime known to have been committed. Rather, Defendants conducted an unreasonable search and did so, in whole or in part, because Plaintiff was a member of the Muro family. In fact, Defendant Hathcox thought that all Muros "may possess deadly weapons." Defendants' conduct violated Plaintiff Juana Muro's First and Fourth Amendment rights.

## VIII. THE UNLAWFUL SEIZURE OF PLAINTIFF ISAAC RODRIGUEZ ON JUNE 20, 2003

96. On June 20, 2003, at approximately 4:15 p.m., Defendant Wall and Defendant Benson came to Plaintiff Isaac Rodriguez's residence. Defendant was apparently told that a suspect in a stolen a purse incident "might" be at the residence and that Plaintiff Javier Muro "matched the description" of another suspect in the incident. Defendant asked Plaintiff did he know where Javier was and whether Javier lived there. Plaintiff responded "no" to both questions.

97. Shortly thereafter, Plaintiff encountered Defendant Wall and Defendant Benson again. Defendant Wall falsely accused Plaintiff of lying to him about not knowing who Javier Muro was and by denying that Javier lived at the residence. Defendant Wall told Plaintiff that he was obstructing an investigation. Defendant then took Plaintiff aside and told him that his alleged

lying was wasting Defendant's time, was "detrimental," and indicated that he was involved in the purse snatching crime. He further told Plaintiff that Plaintiff must cooperate with him "completely" in order "to negate" Defendant's belief that Plaintiff was involved in the crime under investigation. Defendant made this threat in the absence of any information that Plaintiff had been involved in the alleged purse theft. Defendant made it clear to Plaintiff that he would likely be arrested and jailed if he did not cooperate to Defendant's satisfaction. Plaintiff was extremely frightened at this point.

98. Defendant Wall demanded to know where Javier Muro could be found. Plaintiff said Javier might be at his girlfriend's house. When Defendant asked where she lived, Plaintiff told him that he did not know the exact street address but knew how to get there. Defendant Wall then told Plaintiff he was going to go with Wall and Benson and show them where the house was. Plaintiff was then handcuffed, subjected to a pat down by Benson, placed in Defendant Benson's unit and driven to the location of Javier's girlfriend's house. At the house he was required to sit, handcuffed in the unit, while Defendants completed their investigation. Plaintiff was then driven back and released.

99. Plaintiff was detained for approximately 20-30 minutes. At no time during the interrogation of Plaintiff was Plaintiff advised of his rights as required by NMSA 1978, §32A-2-14(C).

100. The detention of Plaintiff was an unreasonable investigative detention and/or a de facto arrest without probable cause. The conduct of Defendants Wall and Benson violated his Fourth Amendment right to be free from unreasonable searches and seizures.

## IX.    THE INITIATION OF CRIMINAL CHARGES AGAINST AND MALICIOUS PROSECUTION OF JAVIER MURO

101.  On September 19, 1999, Defendant Helton encountered Plaintiff Javier Muro, then age 14 ½ . He was in an apartment sitting on a couch and did not appear to be intoxicated nor was he in possession of any beer or other alcoholic beverage.  Approximately 10 to 15 other juveniles were present, some with alcohol in their possession.  Defendant Helton, who knew Plaintiff was one of the Muro brothers, and knew he was a minor, ordered Plaintiff outside the apartment and began interrogating him about whether he had consumed any alcohol earlier in the day.

102.  At no time prior to or during the interrogation did Defendant inform Plaintiff that, as a child, he had a right not to answer any questions, or that any answers he gave could and would be used against him, or that he had the right to have an attorney, paid for by the State, present during any questioning.  Nor did Defendant obtain or even attempt to obtain a knowing intelligent waiver of his constitutional rights from Plaintiff.  Defendant failed to provide this information to Plaintiff despite the fact that New Mexico law, §32A-2-14(A), NMSA, expressly required that a minor suspected of a crime such as Minor in Possession of Alcohol must be advised of his constitutional rights before being questioned or interrogated and further mandates that Defendant was required to obtain a knowing, intelligent and voluntary waiver of those rights before asking Plaintiff questions.

103.  Plaintiff Javier Muro answered Defendant's questions and told him he had consumed two beers earlier in the day.  At the time of the incident, the New Mexico appellate courts had

34

clearly established that one does not "possess" alcohol in one's body and that the presence of alcohol in one's body does not constitute "possession" for purposes of the criminal law. In fact, during 1997, the New Mexico Court of Appeals, in *State v. Twayne*, 123 N.M. 42 (Ct. App. 1997), had expressly stated that the smell of alcohol on a person's breath combined with a child's admission that he had consumed a beer outside an officer's presence was insufficient evidence that he had committed the crime of "Minor in Possession of Alcohol."

104.  Despite this clearly established law, Defendant Helton initiated charges against Plaintiff in Children's Court by issuing him a citation which charged him with "Minor in Possession of Alcohol." The charge was based solely on Defendant's claim that he had smelled alcohol on Plaintiff and that Plaintiff had admitted he consumed two beers earlier in the day. As a result of the issuance of the citation, Plaintiff was compelled to appear in Children's Court and to stand trial.

105.  Based upon Defendant Helton's testimony to this effect, Plaintiff was convicted in Children's Court of that offense. Upon information and belief, other minors present who did not appear intoxicated and did not have alcohol in their possession or control were not similarly prosecuted. Defendant Helton appeared at Plaintiff's May, 2000 sentencing hearing. Although Defendant did not testify, he was there to impress the court with the need to give Plaintiff a harsh sentence. Despite the fact that this was the first time Plaintiff had been convicted of this offense and despite the fact that §60-7-(B)1(C)(1), NMSA expressly mandates that the punishment for this offense is a fine up to $1000 and/or 30 days of community service, Plaintiff was sentenced, inter alia, to serve <u>a year of incarceration</u> at the New Mexico Boy's School in Springer, New

35

Mexico. Upon information and belief, Defendant Helton and/or other members of the HPD brought improper influence to bear upon the sentencing process which was a cause of the disparately harsh sentence Plaintiff received. Plaintiff was released from Springer in May, 2001 after serving his one-year sentence. His conviction was reversed by the New Mexico Supreme Court on September 26, 2001. *State v. Javier M.*, 131 NM 1 (2001).

106. Because §32A-2-14(C), NMSA placed substantive limitations on Defendant's discretion regarding the interrogation of a juvenile and Defendant Helton interrogated Javier in violation of the mandatory duty imposed on him by that statute, Defendant's conduct violated Javier's liberty interest protected by the due process clause of the Fourteenth Amendment. Defendant's conduct also violated Plaintiff's right to liberty and due process secured to him by the New Mexico Constitution and violated Plaintiff's rights guaranteed by §32A-2-14 (C), both of which are actionable under the New Mexico Tort Claims Act, 41-4-12, NMSA.

107. The prosecution of Plaintiff was initiated by Defendant Helton maliciously and without probable cause, as Defendant invoked the criminal process without any reasonable hope of ultimate success. The prosecution terminated in a manner favorable to Plaintiff, but not until after he was seized and deprived of his liberty for a year.

108. At all times material hereto, Defendant Helton acted in concert with, jointly participated with, and/or advised, assisted and otherwise influenced the Children's Court prosecutor for the Fifth Judicial District Attorney in the pursuit of the prosecution and sentencing of Plaintiff. Defendant acted intentionally, wilfully, deliberately, and/or with deliberate indifference to the rights of Plaintiff. His conduct violated Plaintiff's Fourth Amendment right to

36

be free from unlawful seizure of his person and his Fourteenth Amendment right to due process of the law. Defendant's conduct also constituted a malicious prosecution under state law, actionable pursuant to §41-4-12, NMSA.

109. At all times material hereto, Defendant Helton was acting pursuant to a Defendant City of Hobbs custom or policy of questioning juveniles who were the subject of investigatory detentions, which did not amount to custodial interrogations, without first informing them of their *Miranda* rights and obtaining a knowing and intelligent waiver of those rights, and then using the information unlawfully obtained in subsequent criminal prosecutions. Furthermore, this was a custom and policy undertaken in concert with, approved, condoned and/or acquiesced in by the Children's Court prosecutors in Lea County in Plaintiff's case and numerous other cases.

110. Defendant's conduct was arbitrary, capricious, motivated by ill-will and personal vindictiveness and had no legitimate governmental purpose. Defendant's decision to initiate charges and criminal proceedings against Plaintiff was motivated, in whole or in part, by an animus against Plaintiff because of his association with and relationship as part of the Muro family. Defendants' conduct violated Javier Muro's First and Fourteenth Amendment rights to association and equal protection of the law.

## X. **THE UNLAWFUL FEBRUARY, 2002 DETENTION OF PLAINTIFF MANUEL MURO**

111. On February 2, 2002, Plaintiff Manuel Muro, then age 21, was lawfully at Sprint PCS, a cell phone store in Hobbs, New Mexico, conducting personal business. Defendant Wilkison, who was off duty at the time, walked into the store, saw Plaintiff and seized him, falsely

37

claiming the HPD had a warrant for his arrest. Defendant Wilkison confronted Plaintiff in full view of the store employees.

112. There may have been a warrant for a heavyset, 30-something year-old man also named Manuel Muro. Plaintiff, who is 5'6", 165 lbs. and 20 years old, told Defendant Wilkison he had a 30 year-old cousin with the same name who may have been the subject of an arrest warrant. Plaintiff did not appear to be 30 years old and no police officer would have reasonably believed Plaintiff remotely fit the physical description of the individual for whom a warrant was outstanding. Plaintiff told Defendant he wanted to leave. Defendant, who had not familiarized himself with the readily available information about the wanted individual, told Plaintiff he could not leave. Plaintiff was detained against his will, in public view, for approximately 15 minutes before he was allowed to leave.

113. Defendant Wilkison's failure to familiarize himself with the information readily available regarding the individual for whom an arrest warrant had issued prior to seizing Plaintiff was objectively unreasonable. Any reasonable officer who had familiarized himself with the information that was readily available would not have subjected Plaintiff to an investigative detention as there was no reasonable suspicion to believe Plaintiff was the individual for whom the warrant had issued.

114. Defendant Wilkison acted intentionally, wilfully, deliberately and/or with deliberate indifference to the rights of Plaintiff and his conduct violated Plaintiff's Fourth and Fourteenth Amendment rights. Defendant's conduct was arbitrary, capricious, motivated by ill-will and personal vindictiveness and had no legitimate governmental purpose. Defendant's decision to

38

initiate charges and criminal proceedings against Plaintiff was motivated, in whole or in part, by an animus against Plaintiff because of his association with and relationship as part of the Muro family. Defendants' conduct violated Manuel Muro's First and Fourteenth Amendment rights to association and equal protection of the law.

## XI. **MUNICIPAL LIABILITY**

115. Defendant City of Hobbs failed to provide proper training or failed to insure that training was adequately understood by subordinate officers in the areas of investigative detentions, arrests, obtaining and executing search warrants, the circumstances under which personal property may be seized and the statutory and constitutional rights of juveniles. These failures were a direct cause of the injuries complained of by Plaintiffs herein.

116. Defendant City of Hobbs failed to properly supervise and/or discipline subordinate officers who engaged in acts of retaliation, who committed unlawful searches and seizures, who filed charges without probable cause, who violated the statutory and/or constitutional rights of juveniles, and/or who harassed minority citizens. Said Defendant maintained unwritten customs or policies which permitted or condoned the above-described acts. These customs or policies are demonstrated, inter alia, by the repeated instances where HPD officers detain citizens for substantial periods of time and fail to question them in a timely manner so as to confirm or dispell any reasonable suspicion the officers might have had as to whether the detained citizen committed or was about to commit a crime. These policies are further demonstrated by the Defendant's failure to adequately investigate the numerous complaints of police misconduct they have received

against subordinate officers, including Defendants Gronewald, Gunter and Wilkison, and/or by their failure to take adequate remedial action regarding officer misconduct.  These policies are also demonstrated by Defendants' practice or custom of promoting officers including Defendant Durham and others who are the subject of judicial findings of improper conduct and citizen complaints and lawsuits alleging such misconduct.

117.  Defendant acted intentionally and/or with deliberate indifference to the rights of citizens, including Plaintiffs.  Defendant's acts and omissions were a direct cause of the injuries suffered by Plaintiffs.

118.  Defendant City of Hobbs also maintained an unwritten custom or policy which permitted or condoned the harassment of members of families disliked by HPD officers. This custom or policy included but was not limited to harassment of members of the Muro family, the family of Ernest and Verna Hodge, and the family of Carl Mackey  Defendant's acts and omission were a direct cause of the injuries complained of by Plaintiffs.

119.  Defendant City of Hobbs maintained an unwritten custom or policy which permitted or condoned: a) the seizure of personal property without probable cause, and b) the holding of seized property without a pre-deprivation hearing or a prompt post-deprivation hearing to determine whether probable cause existed for the seizure.  Defendant's acts and omissions were a direct cause of the injuries suffered by Plaintiff Luis Ruiz.

120.   During the time period from 1999 through 2002, Defendants Gronewald, Gunter, **Luna** and Wilkison were the subject of numerous citizen complaints alleging unlawful searches and seizures, **failure to act,** excessive uses of force and/or harassment, most of which were made by

members of minority groups.  Defendant Wilkison was the subject of ten such complaints during
this time period, all of which were made by members of minority groups, while Defendants
Gronewald, Gunter, Helton, Kim, Shaw and Cunningham were also the subject of numerous such
complaints.   Additionally, during this time period, Defendants subjected minority citizens such as
Plaintiffs to disparately harsh law enforcement tactics and treatment resulting in
disproportionately higher number of arrests, investigative detentions and issuance of traffic
citations to minority citizens.  Defendants' unlawful seizures of these Hispanic Plaintiffs and/or
their property, as complained of herein, and their failure to provide Plaintiffs with the rights
guaranteed to them by state statutory law were part of a pattern of discriminatory conduct by
Defendants and constituted a violation of Plaintiffs' Fourteenth Amendment right to the equal
protection of the law and a violation of their rights under 42 U.S.C. §1981.

## XII.  DAMAGES

121.  As a direct and proximate result of the acts and omissions of the Defendants described in
this Complaint, Plaintiff Manuel Muro suffered and continues to suffer severe emotional pain and
suffering, anxiety, humiliation, embarrassment and the violation of his federal constitutional rights.

122.  As a direct and proximate result of the acts and omissions of the Defendants described in
this Complaint, Plaintiff Veronica Chavez suffered and continues to suffer severe emotional pain
and suffering, anxiety, humiliation, embarrassment and the violation of her federal constitutional
rights.

123. As a direct and proximate result of the acts and omissions of the Defendants described in this Complaint, Plaintiff Angela Muro suffered the violation of her federal constitutional rights.

124. As a direct and proximate result of the acts and omissions of the Defendants described in this Complaint, Plaintiff Jose Muro suffered and continues to suffer severe emotional pain and suffering, anxiety, humiliation, embarrassment and the violation of his federal constitutional rights.

125 As a direct and proximate result of the acts and omissions of the Defendants described in this Complaint, Plaintiff Sonia Pinto suffered and continues to suffer severe emotional pain and suffering, anxiety, humiliation, embarrassment and the violation of her federal constitutional rights.

126. As a direct and proximate result of the acts and omissions of the Defendants described in this Complaint, Plaintiff Amy Muro suffered emotional pain and suffering, anxiety, humiliation, embarrassment and the violation of her federal constitutional rights.

127. As a direct and proximate result of the acts and omissions of the Defendants described in this Complaint, Plaintiff Sally Muro suffered emotional pain and suffering, anxiety, humiliation, embarrassment and the violation of her federal constitutional rights.

128 As a direct and proximate result of the acts and omissions of the Defendants described above, Plaintiff Jose Muro, Jr. suffered emotional pain and suffering, anxiety, humiliation, embarrassment and the violation of his federal constitutional rights.

129. As a direct and proximate result of the acts and omissions of the Defendants described in this Complaint, Plaintiff Javier Muro suffered and continues to suffer severe emotional pain and

suffering, loss of income, anxiety, humiliation, embarrassment and the violation of his federal constitutional rights.

130. As a direct and proximate result of the acts and omissions of the Defendant described in this Complaint, Plaintiff Juana Muro suffered and continues to suffer severe emotional pain and suffering, anxiety, humiliation, embarrassment and the violation of her federal constitutional rights.

131. As a direct and proximate result of the acts and omissions of the Defendants described in this Complaint, Plaintiff Isaac Rodriguez suffered and continues to suffer severe emotional pain and suffering, anxiety, humiliation, embarrassment and the violation of his federal constitutional rights.

132. As a direct and proximate result of the acts and omissions of the Defendants described in this Complaint, Plaintiff Alex Guillen suffered and continues to suffer severe emotional pain and suffering, anxiety, humiliation, embarrassment and the violation of his federal constitutional rights.

133. As a direct and proximate result of the acts and omissions of the Defendants described in this Complaint, Plaintiff Melissa Guillen suffered and continues to suffer severe emotional pain and suffering, anxiety, humiliation, embarrassment and the violation of her federal constitutional rights.

134. As a direct and proximate result of the acts and omissions of the Defendants described in this Complaint, Plaintiff Luis Ruiz suffered and continues to suffer emotional distress, anxiety, inconvenience from the loss of the use of his vehicle, loss of his personal property, humiliation, embarrassment and the violation of his federal constitutional rights

43

135. Because of the intentional, willful, malicious and/or reckless indifference of Defendants'
conduct, Plaintiffs are entitled to punitive damages against Defendants Coburn, Conger, Cooley,
Luna, Gronewald, Gunter, Helton, Wilkison, Fuller, Keenan, Wright, Cunningham, Weis and any
other defendants for violating their federal rights as described in this Complaint.

WHEREFORE, Plaintiffs pray for judgment against Defendants and each of them as follows:

1. For compensatory damages in an amount to be determined by the trier of fact, jointly and
severally.

2. For nominal damages for Plaintiff Angela Muro.

3. For punitive damages, in an amount to be determined by the trier of fact.

4. For pre-judgment and post-judgment interest.

5. For attorneys fees and costs pursuant to 42 U.S.C. §§1981 and 1983.

6. For such other and further relief as the Court deems just and proper.

Respectfully Submitted,

Richard Rosenstock, Attorney for Plaintiffs
PO Box 10230
Santa Fe, NM 87504-6230
(505) 988-5324 Fax: (505) 989-4844

Daniel Yohalem, Attorney for Plaintiffs
1121 Paseo de Peralta
Santa Fe, NM 87501
(505) 983-9433 Fax: (505) 989-4844

44